# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  June 16, 2016

Mr. Ali Wehby Charara
31731 Northwestern Highway, Suite 333
Farmington Hills, MI 48334

Mr. David R. Deromedi
Dickinson Wright
500 Woodward Avenue
Suite 4000
Detroit, MI 48226

Ms. Tacy Fletcher Flint
Mr. Steven Joseph Horowitz
Ms. Anne E. Rea
Mr. John Mark Skakun III
Sidley Austin
1 S. Dearborn
Chicago, IL 60603

Ms. Melissa Markos Nyman
Nyman Turkish
5800 Stanford Ranch Road, Suite 720
Rocklin, CA 95765

Ms. Ann M. Sherman
Office of the Attorney General of Michigan
P.O. Box 30736
Lansing, MI 48909

Mr. Jason Marc Turkish
Nyman Turkish
20700 Civic Center Drive, Suite 115
Southfield, MI 48076

Mr. Peter Hey Webster
Dickinson Wright
2600 W. Big Beaver Road
Suite 300
Troy, MI 48084

Re: Case No. 12-2263, *Angelo Binno v. The American Bar Association*
Originating Case No. : 2:11-cv-12247

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0140p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

ANGELO BINNO,

*Plaintiff-Appellant,*

v.

THE AMERICAN BAR ASSOCIATION,

*Defendant-Appellee.*

No. 12-2263

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-12247—Denise Page Hood, Chief District Judge.

Argued: October 8, 2015

Decided and Filed: June 16, 2016

Before: MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Jason Marc Turkish, NYMAN TURKISH PC, Southfield, Michigan, for Appellant. Anne E. Rea, SIDLEY AUSTIN LLP, Chicago, Illinois, for Appellee. Ann M. Sherman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Amicus Curiae. **ON BRIEF:** Jason Marc Turkish, NYMAN TURKISH PC, Southfield, Michigan, Melissa M. Nyman, Rocklin, California, Richard H. Bernstein, THE SAM BERNSTEIN LAW FIRM, Farmington Hills, Michigan, for Appellant. Anne E. Rea, Tacy F. Flint, John M. Skakun III, Steven J. Horowitz, SIDLEY AUSTIN LLP, Chicago, Illinois, for Appellee. Ann M. Sherman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Amicus Curiae.

DAUGHTREY, J., delivered the opinion of the court in which MERRITT, J., joined and GRIFFIN, J., joined in the result. GRIFFIN, J. (pp. 13–20), delivered a separate opinion concurring in the judgment.

No. 12-2263                          *Binno v. Am. Bar Ass'n*                          Page 2

———————————

**OPINION**

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Plaintiff Angelo Binno is a legally blind individual who applied for admission to several law schools, unsuccessfully, and thereafter filed an action against the American Bar Association, under the Americans with Disabilities Act (ADA or the Act), claiming that his lack of success was due to a discriminatory admissions test "mandated" by the ABA.  The admissions examination in question, utilized by nearly all law schools in the United States, is the Law School Admissions Test (LSAT).  Binno contends that the questions on the LSAT have a discriminatory effect on the blind and visually impaired because a quarter of those questions "require spatial reasoning and visual diagramming for successful completion."  He alleges that his poor performance on the LSAT has prevented him from being admitted to accredited law schools, in violation of Titles III and V of the ADA.  The district court granted the ABA's motion to dismiss, finding that plaintiff Binno lacked standing to sue the ABA and, alternatively, that his amended complaint failed to state a claim for relief under either Title III or Title V of the ADA as a matter of law.  We affirm, concluding that Binno does not have standing to sue the ABA because his injury was not caused by the ABA and because it is unlikely that his injury would be redressed by a favorable decision against the ABA.  Moreover, even if Binno could establish standing, the district court correctly dismissed his Title III and Title V claims for failure to state claims for which relief may be granted.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant ABA is a voluntary professional organization that, among other things, is certified by the federal Department of Education as the national legal-education accreditation agency in the United States.[1]  A majority of state high courts rely on the ABA's approval of a law school to determine whether that state's legal education requirement for admission to the bar is satisfied.  The ABA promulgates standards that are binding on law schools in order to gain and

———————————

[1]As a technical matter, the actual accrediting agent is the Council of the ABA's Section on Legal Education and Admission to the Bar, which, on matters of accreditation, maintains independence from its parent organization. Whether graduates of a non-ABA-approved school may be licensed to practice law in a given jurisdiction is a decision made by that jurisdiction's bar admission authority and not by the Council or the ABA.

maintain accreditation. Noncompliance with the ABA Standards may result in sanctions, including loss of a law school's ABA-accreditation status. Relevant to this litigation, ABA Standard 503 provides, in relevant part, "A law school shall require each applicant for admission as a first-year J.D. degree student to take a valid and reliable admission test to assist the school and the applicant in assessing the applicant's capability of satisfactorily completing the school's program of legal admission."

In their admissions process, most American law schools utilize the LSAT as an admissions test, which is the only one that the ABA presumes to be "valid and reliable" under its interpretation of Standard 503.[2] The LSAT currently has sections that test analytical reasoning, reading comprehension, and logical reasoning, and it requires a writing sample. The questions in the analytical-reasoning section also are known as "logic games," which, according to Binno's complaint, "require spatial reasoning and diagramming of visual concepts."[3] Binno alleges that because he is blind, he is "incapable of perceiving spatial relationships or performing the necessary diagramming to successfully complete the logic games questions on the LSAT at a competitive level." He alleges that the analytical-reasoning section thus caused him "substantial embarrassment, emotional distress, and mental anguish during the exam," which negatively impacted his overall performance on the exam. By "offering" such a discriminatory admissions

---

[2]Law schools proposing a program inconsistent with an ABA Standard may apply for a variance from that standard under Standard 803. A law school seeking a variance bears the burden of demonstrating that the variance should be granted. An August 2009 ABA Consultant's Memo notes five law school programs that successfully received variances from Standard 503. The Memo also indicates that the ABA has found one law school that does not use the LSAT to be compliant with Standard 503. According to recent news reports, several law schools are considering seeking authorization to substitute the Graduate Record Examination (GRE) for the LSAT. *See, e.g.*, Karen Sloan, *University of Arizona Law School's Use of GRE Scores Creates LSAT Trouble*, NAT'L L. J., May 2, 2016, *available at* http://www.nationallawjournal.com/id=1202756501823/University-of-Arizona-Law-Schools-Use-of-GRE-Scores-Creates-LSAT-Trouble?slreturn=20160509101934; *see also* Sara Randazzo, *LSAT's Grip on Law-School Admissions Loosens*, WALL ST. J., Feb. 21, 2016, *available at* http://www.wsj.com/articles/lsats-grip-on-law-school-admissions-loosens-1455964203?cb=logged0.08788420751644987. The GRE is an admissions requirement for most graduate schools in this country.

[3]A sample LSAT question attached as Exhibit B to the amended complaint does not "require" a diagram but merely suggests that "[i]n answering some of the questions [in Section 1], it may be useful to draw a rough diagram." Although the standard of review on motion to dismiss for lack of standing requires that the district court, as well as the reviewing court, accept the material allegations of the complaint as true, *see Warth v. Seldin*, 422 U.S. 490, 501 (1975), the plaintiff's allegation that the ABA "forces" a blind applicant "to draw pictures as a condition of applying to law school" is an obvious exaggeration that we need not "construe in favor of the complaining party." *Id.*

test, Binno, alleges, the ABA has caused "significant injury and irreparable harm to the Plaintiff, and others with disabilities, in violation of the ADA.

The ABA responds that although it accepts the LSAT as "valid and reliable," the test is not an ABA product. Instead, the LSAT is written, administered, and scored by the Law School Admission Council (LSAC), an entity that is not part of the ABA. The LSAC provides accommodations for persons with disabilities who wish to take the LSAT. These accommodations include, but are not limited to, additional time to complete the test and the use of a reader during the examination. ABA Interpretation 503-1 allows a law school to "use[] an admission exam other than the [LSAT]" but requires the school to establish that the other test is "valid and reliable." ABA Interpretation 503-2 provides that Standard 503 "does not prescribe the particular weight that a law school should give to an applicant's admission test score in deciding whether to admit or deny admission to the applicant."[4]

Without relevant documentation but nevertheless convinced that he had been denied admission to three law schools in Michigan because of poor LSAT scores that were the result of discriminatory testing, Binno sued the ABA, alleging violation of Section 309 of the ADA's Title III, 42 U.S.C. § 12189, and Section 503 of Title V, 42 U.S.C. § 12203(b). In his amended complaint, Binno claimed that the ABA "has 'offered' and continues to 'offer' a discriminatory examination" in violation of Title III of the ADA. In the alternative, Binno alleged that ABA Standard 503 "interferes" with his ADA rights in violation of Title V of the ADA. Binno requested only equitable relief: (1) a declaration that the ABA has violated Binno's rights under the ADA; (2) an injunction preventing the ABA from accrediting law schools until the ABA "ceases its implementation of Standard 503"; (3) an injunction preventing the ABA from applying Standard 503 to Binno and other legally blind or visually impaired individuals; and (4) an injunction "restraining the [ABA] from discriminating against individuals with disabilities" and requiring that the ABA "provide individuals with disabilities with full and equal access to the programs and services" of law schools.

---

[4]The concurring opinion charges that Standard 503 has a "rigid requirement that law schools require each applicant to submit an LSAT score or else face sanctions or loss of accreditation." However, the record indicates that sanctions are imposed only for "[s]ubstantial or persistent noncompliance with one or more of the Standards" and may take a variety of forms, including a monetary penalty, private or public censure, probation, or "removal from the list of approved law schools."

The ABA moved to dismiss Binno's complaint or, alternatively, for summary judgment. The district court judge granted the ABA's motion to dismiss, holding that Binno had sued the wrong party, that he lacked standing to bring his action, and that if he did have standing, Binno failed to state claims for relief under Title III and Title V of the ADA. Binno now appeals, challenging those determinations.

## II. DISCUSSION

### A. <u>Standing</u>

Binno argues that the district court erred in dismissing his case for lack of standing under Article III of the United States Constitution. Standing is, of course, a threshold requirement for federal jurisdiction. If a party does not have standing to bring an action, then the court has no authority to hear the matter and must dismiss the case. *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 631 (6th Cir. 2015). To establish Article III standing, the plaintiff must allege that: (1) he has suffered an injury-in-fact that is both "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is fairly traceable to the defendant's conduct; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999). In the case of a plaintiff seeking equitable relief, as Binno does here, the claimant must allege "actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *Daubenmire v. City of Columbus*, 507 F.3d 383, 388 (6th Cir. 2007) (internal quotation marks and citation omitted). "The party seeking to invoke federal jurisdiction bears the burden to demonstrate standing and he 'must plead its components with specificity.'" *Id.* (quoting *Coyne*, 183 F.3d at 494).

We review *de novo* a district court's determination of Article III standing. *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012). In reviewing a challenge to standing, we may consider the complaint and any accompanying materials. *Id.* In evaluating a motion to dismiss, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.

### 1. Injury-In-Fact

To establish Article III standing, a plaintiff first must demonstrate that he has suffered an injury-in-fact that is both "concrete and particularized" and "actual or imminent," *Lujan*, 504 U.S. at 560-61, based on facts that are both "specific" and "concrete." *Warth*, 422 U.S. at 508. Conclusory allegations do not satisfy the requirements of Article III. *See id.*

In terms of injury, Binno alleges that he is "forced to take an examination [that] discriminates against blind and visually impaired persons" because it includes analytical questions that he cannot answer competitively, *i.e.*, on equal footing with other law school applicants, which in turn causes him emotional distress that affects his performance on the rest of the test. Because the ABA does not appear to contest that Binno has a legally cognizable injury-in-fact, we move on to consider the remaining two standing factors, the existence of which the ABA does dispute.

### 2. Causation

To establish Article III standing, Binno also must demonstrate a causal connection between his injury and the defendant's conduct. *Lujan*, 504 U.S. at 560-61. Binno argues that his injury is fairly traceable to the actions of the ABA because ABA Standard 503 effectively compels law schools to require the LSAT. In response, the ABA argues that because it is neither responsible for the content of the LSAT nor for law schools' use of the LSAT in law school admissions, Binno's injury is not caused by the ABA's actions. The district court found that Binno did not establish causation because the "facts set forth in the Amended Complaint allege that Binno's injuries are from the questions posed on the LSAT, not [from] the ABA Standard 503." We agree with this assessment.

Binno contends that his injury is traceable to the ABA because ABA Standard 503 *compels* law schools to require the LSAT in law school admissions. However, this argument is not supported by the record, including allegations in the amended complaint. Under Standard 503, a "valid and reliable" admission test must be taken by all law school applicants as a requirement for a school's accreditation, and in Interpretation 503-1, the ABA does accord the LSAT presumptive validity. But that policy explicitly allows law schools to use an admission

exam other than the LSAT and, most significant in terms of Binno's plight, Interpretation 503-2 provides that the weight given an individual applicant's exam score is to be determined at the discretion of the law school. It is thus clear that the ABA does not actually "mandate" use of the LSAT and, moreover, nothing in the standards gives the ABA authority to prescribe its content. In that sense, the district court correctly noted that Binno had sued the wrong party. The law schools to which he applied, not the ABA, determine what weight, if any, to give Binno's LSAT score, and the entity in control of the LSAT's content and format is not the ABA but the LSAC. As the district court found, "There are no allegations that the ABA, itself, directed these questions to be included on the LSAT."

### 3. Redressability

The third prong of an Article III standing analysis considers whether it is likely that the plaintiff's injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560. Binno fails to establish redressability for many of the same reasons that he cannot demonstrate causation. Even if we were to grant Binno's requested relief by somehow making Standard 503 optional, law schools still could choose to require the LSAT in their admissions process. Because Binno's relief depends on action by the law schools—third parties that are not before the court—a favorable decision by this court is not likely to redress Binno's injury. *See id.*

Thus, even if we accept the unchallenged proposition that Binno has demonstrated injury-in-fact, we nevertheless must conclude that he has failed to establish the required causation and redressability that would support his standing to bring this action against the ABA. Moreover, even if we could find that Binno has standing, our review of the statutory bases he proposes would lead us to affirm the district court's decision to dismiss.

### B. The ADA Claims

### 1. Title III

To survive a motion to dismiss, a plaintiff must allege facts with sufficient specificity to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The plausibility standard "asks for more than a sheer possibility that a defendant has

acted unlawfully," *id*, and instead "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [unlawful conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Under the standard set out in *Iqbal* and *Twombly*, a court accepts as true all factual allegations, but the court does not apply this presumption of truth to conclusory or legal assertions. *Iqbal*, 556 at 678-79. If the plaintiff's facts, accepted as true, do not state a claim that has facial plausibility, the plaintiff has not satisfied the pleading requirements under Rule 8, and the complaint will be dismissed. We review the district court's ruling on a motion to dismiss *de novo. In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2010).

Here, Binno first argues that the district court incorrectly dismissed his claim brought pursuant to the provisions of Title III of the ADA. Title III requires a private entity that "offers" admissions examinations to provide such examinations "in a place and manner accessible to persons with disabilities" or to offer alternative accommodations for such persons. 42 U.S.C. § 12189.[5] Binno contends that, consistent with the remedial purpose of the ADA, the term "offer" should be interpreted broadly to mean that the ABA "offers" the LSAT, because pursuant to accreditation Standard 503, the ABA "fully reviews, verifies, and mandates the LSAT" in law school admissions. In response, the ABA points out that the it cannot be said to offer the LSAT because it does not make the examination available to test-takers, nor does it exert any control over the "place and manner" of the test's administration. The district court found that because Binno had not pleaded facts to indicate that the ABA administered, developed, or controlled the format of the LSAT, he had failed to state a claim under Title III of the ADA.

In interpreting a statute, we begin with its text. *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous"). If a term in a statute is undefined, it is interpreted using its ordinary meaning. *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994). If a term is used multiple times in the same statute, we presume that it has the same meaning wherever it is used in the statute. *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2441 (2014) ("One ordinarily assumes that identical words used

---

[5]Section 309 of Title III states: "Any [private entity] that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189.

in different parts of the same act are intended to have the same meaning.") (internal citation omitted). "Analysis of the statutory text, aided by established principles of interpretation, controls." *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014).

The term "offer" is not defined in Section 309, nor is it defined elsewhere in the ADA. However, the term is used three times within Section 309: "Any [private entity] that *offers* examinations . . . shall *offer* such examinations or courses in a place and manner accessible to persons with disabilities or *offer* alternative accessible arrangements for such individuals." 42 U.S.C. § 12189 (emphasis added). The context indicates that an entity that "offers examinations" under this provision must be able to provide an accessible "place and manner" for administration of the tests, or arrange for alternative, accessible accommodations.

The regulations that implement Section 309 discuss the administration of the exam and, accordingly, support the interpretation that an entity offering the exam must have significant control over its administration or accommodation.[6]   Binno argues that because the word "selected" is used within the implementing regulations,[7] an entity that "selects" the exam also "offers" it. However, in doing so he ignores the fact that the term "selects" refers only to entities that "offer" an examination under Section 309.

Binno also insists that an entity that "reviews, verifies, and mandates the LSAT" must be held to offer the exam for the purposes of Section 309, but this argument is not supported by either the text of the statute or the cases interpreting the statute. Even if we construe it broadly because of the remedial nature of the statute at issue, *see, e.g.*, *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), the term "offer" must nevertheless be interpreted so that Section 309 is not meaningless. Because the statute states that an entity that "offers" exams must do so "in a place and manner accessible" to disabled persons or else offer alternative accommodations, the entity

---

[6] For example, the regulations implementing Section 309 discuss "alternative accessible arrangements" with respect to how the exam is administered. *See, e.g.*, 28 C.F.R. § 36.309(4) ("alternative accessible arrangements may include, for example, provision of examination at an individual's home with a proctor").

[7] The relevant regulation states: "Any private entity offering an examination covered by this section must assure that [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)." 28 C.F.R. § 36.309(b)(1)(i).

must have some ability to grant those accommodations in the administration of the exam. An entity without the authority to grant such accommodations would not be able to effectuate the purpose of Section 309.[8]

Indeed, Binno apparently concedes that the ABA is subject to Section 309 only "to the extent that [the ABA] exercises control over the manner in which the examination is given," but he then fails to allege the manner in which that control is actually exercised by the ABA. Binno cites *Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164 (D.D.C. 2011), and *Elder v. Nat'l Conference of Bar Exam'rs*, C-11-00199-SI, 2011 WL 672662 (N.D. Cal. Feb 16, 2011), to argue that Title III claims may be asserted against entities that do not administer an exam. However, in both these cases, defendant National Conference of Bar Examiners developed the content and format of the examination in question and had the actual ability to influence the manner and administration of the exam.

In sum, Binno has not pleaded any facts in his complaint that demonstrate that Standard 503 gives the ABA authority over the manner and administration of the LSAT. Nor has he pleaded any facts that show that the ABA has authority to grant accommodations or make other arrangements in connection with the exam. Indeed, Binno undoubtedly cannot plead such facts, because it is the LSAC, and not the ABA, that develops and administers the LSAT and grants accommodations in the testing format. Because Binno has not pleaded facts to support a facially plausible claim, his Title III claim against the ABA fails as a matter of law.

### 2. Title V

Binno next argues that the district court erred in dismissing his claim brought pursuant to Title V of the ADA, which prohibits, among other things, "interference" with rights granted or

---

[8] The legislative history of Section 309 also supports the interpretation that an entity "offers" an exam if it can exert control over the administration, accessibility, or accommodation of that exam. That history indicates that Section 309 "was adopted to assure that persons with disabilities are not foreclosed from educational, professional, or trade opportunities because an examination or course *is conducted in an inaccessible site or without an accommodation*." H.R. REP. No. 101–485(III), at 68–69 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 491–92 (emphasis added). The legislative history also notes that "accessible to persons with disabilities . . . includes physical access as well as accommodations in the way the test is administered, e.g. extended time or assistance of a reader." *Id.* The purpose of the statute is to ensure that the exam is accessible to persons with disabilities in the exam's administration and accommodations.

protected under Title III.[9]  He alleges that the ABA violated Title V of the ADA because Standard 503 "interferes" with Binno's right to take an exam that is accessible to him or otherwise accommodates his disability.  The district court dismissed that claim outright, reasoning that because Binno had failed to allege a violation of his rights under Title III of the ADA, he could not claim interference with the exercise of those rights under Title V of the ADA.  Although that logic is superficially appealing, we can envision, at least hypothetically, that there could be interference with the rights of a disabled individual by a third party.  However, to plead a Title V violation successfully, Binno would have to allege facts to demonstrate that the ABA had interfered with the offering of the LSAT, *i.e.*, the administration of the test in a place and manner accessible to persons with disabilities or the provision of alternative accessible arrangements.  We have already held that Standard 503 does not violate Title III, and the allegations in Binno's complaint are not sufficient to establish a claim of interference under Title V.

## III.  CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.  In doing so, however, we are left puzzled by Binno's failure to litigate against the LSAC, rather than the ABA.  His amended complaint, filed in August 2011, followed by over four years the ruling in *Love v. Law Sch. Admission Council, Inc.*, 513 F. Supp. 2d 206, 223 (E.D. Pa. 2007), that the LSAC is "a covered entity under the [ADA]," and by over a decade similar litigation in *Agranoff v. LSAC, Inc.*, 97 F. Supp. 2d 86, 87 (D. Mass. 1999).  Indeed, in *Love*, the LSAC conceded that it was subject to Title III.  *Love*, 513 F. Supp. 2d at 223.  By contrast, we have been pointed to no cases in which a Title III or Title V claim has been brought against the ABA, successfully or otherwise.

In addition to other, prior litigation against the LSAC, there is now pending the ongoing administration of a nationwide consent decree in a class-action suit brought against the LSAC by the California Department of Fair Employment and Housing (DFEH) and joined by the United

---

[9]Section 503(b) of Title V provides, in relevant part:  "It shall be unlawful to coerce, intimidate, threaten, or *interfere* with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b) (emphasis added).

States Department of Justice (USDOJ).  The original action sought damages and injunctive relief stemming from alleged failures of the LSAC to provide reasonable accommodations to impaired test-takers of the LSAT, in violation of the ADA.  *See Dep't of Fair Emp't & Hous. v. Law Sch. Admissions Council, Inc.*, No. 12-cv-01830-JCS, 2015 WL 4719613 (N.D. Cal. Aug. 7, 2015); *see also Dep't of Fair Emp't & Hous. v. Law Sch. Admission Council Inc.*, 896 F.Supp.2d 849 (N.D. Cal. 2012).  In its most recent opinion, the district court considered and approved recommendations from a panel of five experts concerning how the LSAC should accommodate individuals with visual impairments in the "analytical reasoning section of the LSAT exam because of its reliance on visual-spatial abilities."  2015 WL 4719613 at *12.  Unless Binno is seeking to be relieved altogether of the obligation of taking the LSAT, a more practical approach to achieving admission to law school than years of fruitless litigation against a remote accrediting body might well be to take advantage of the consent decree that the DFEH and the USDOJ have entered with LSAC.

No. 12-2263                    *Binno v. Am. Bar Ass'n*                    Page 13

---

### CONCURRENCE IN THE JUDGMENT

---

GRIFFIN, Circuit Judge, concurring in the judgment.  Plaintiff alleges that the American Bar Association (ABA) has monopolized the law school entrance exam market.  As the entity that controls the accreditation of every law school in this country, the ABA compels every law school applicant to take a "valid and reliable" entrance exam, while at the same time conferring the "valid and reliable" label to one test, and one test only—the LSAT.  Unfortunately, it appears that a portion of the LSAT is unfairly discriminatory toward the blind and visually impaired.  That puts plaintiff and all other blind people seeking to attend law school at a distinct disadvantage, both while taking the test and while competing with other applicants in the admissions process.  Plaintiff has asked law schools to waive the requirement that he take the LSAT and submit his score as part of his application; they have refused, plaintiff claims, for fear the ABA would revoke their accreditation.  This is the sum and substance of the allegations in plaintiff's complaint.

Contrary to the majority's ruling, I conclude that taken together these allegations form the necessary elements of Article III standing for plaintiff's claims against the ABA.  Being required to take an unfairly discriminatory exam and submit it as part of a law school application is a judicially cognizable injury; that injury is fairly traceable to the ABA, which compels, without exception, that law schools require applicants to submit that exam score; and that injury is likely to be redressed through a judicial decision holding the entity's requirement unlawful.  Because the majority concludes otherwise, I respectfully disagree with Section II.A of the majority opinion.

The standing issue aside, I agree with my colleagues that plaintiff's allegations do not state a claim for relief under Titles III and V of the Americans with Disabilities Act.  Therefore, I join Section II.B of the majority opinion and concur in the judgment.

## I.

The ABA governs the accreditation of law schools in this country. To become and remain accredited, law schools must comply with certain standards promulgated by the ABA. One of those standards is Standard 503. It states that "[a] law school shall require each applicant for admission as a first year J.D. student to take a valid and reliable admission test to assist the school and the applicant in assessing the applicant's capability of satisfactorily completing the school's educational program." According to the ABA, only one test is presumptively "valid and reliable" for purposes of Standard 503—the Law School Admission Test (LSAT). Law schools that wish to use a different test must persuade the ABA that it is "valid and reliable." However, that option (known as a "variance") is only available on a programmatic basis, not for individual applicants. Law schools are free to give whatever weight they choose to an individual applicant's LSAT score, but they are prohibited from waiving the examination requirement for any applicant. The net result of the ABA's standards is this: virtually every American law school—though they may give whatever weight they choose to an individual's score—requires each applicant to submit an LSAT score as part of his or her application.

The LSAT contains a significant number of questions that require spatial reasoning and encourage diagramming of visual concepts. As a blind person, plaintiff is unable to conceive of spatial relationships. He is therefore at a distinct disadvantage in taking this portion of the test. Plaintiff alleges that his experience answering these discriminatory questions also negatively affects his performance on the remainder of the exam. Plaintiff has applied to three law schools, but has been denied admission as a result of his poor LSAT performance. In at least one instance, he tried to obtain an LSAT waiver, but could not "as a result of Standard 503."

In response, plaintiff brought this action against the ABA, alleging that Standard 503's prohibition on individual exam waivers violates Titles III and V of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12189 and 12203(b), respectively. The district court dismissed plaintiff's complaint on two alternative grounds: (1) failure to establish Article III standing, and (2) failure to state a claim for relief. I agree with the majority that the district court properly dismissed plaintiff's complaint for failure to state a claim. However, for the reasons that follow, I cannot join its conclusion that plaintiff lacks standing.

## II.

The irreducible minimum of Article III standing has three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered a concrete and particularized injury-in-fact that is either actual or imminent, as opposed to conjectural or hypothetical. *Fieger v. Michigan Supreme Court*, 553 F.3d 955, 962 (6th Cir. 2009). Second, the plaintiff's injury must be "fairly traceable" to the challenged action of the defendant. *Id.* And third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.*

In evaluating plaintiff's standing at the pleading stage, we must confine ourselves to the four corners of the complaint, *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 706 (6th Cir. 2015), we must accept as true all material allegations relating to the elements of standing, *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996), and we must construe the complaint in plaintiff's favor, *Warth v. Seldin*, 422 U.S. 490, 501 (1975). My basic disagreement with the majority is that it fails to observe this standard of review and, in so doing, misapplies the second and third elements of standing.

## A.

The injury-in-fact prong of the standing doctrine requires that a judicially cognizable harm have already occurred or be likely to occur "imminently." *Parsons*, 801 F.3d 710. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Defs. of Wildlife*, 504 U.S. at 561 (internal quotation marks and brackets omitted).

Plaintiff's legal theory is that the ABA discriminates against blind law school applicants by compelling law schools to require all applicants submit an LSAT score, without the option of waiving the requirement for certain individual applicants. Plaintiff alleges that he is harmed by having to sit through a discriminatory examination and by having to submit the results as part of his law school application. These are particularized injuries judicially cognizable under our standing jurisprudence. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (inability to

compete on equal footing with other applicants a cognizable injury-in-fact); *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984) ("[S]tigmatic injury . . . is judicially cognizable to the extent that [the plaintiff is] personally subject to discriminatory treatment."). Plaintiff also alleges that he wishes to reapply to law school free of the requirement that he submit an LSAT score, thereby establishing an "imminent" harm for purposes of seeking prospective relief. *See Gratz*, 539 U.S. at 262 (holding that allegation that applicant is "able and ready" to reapply is sufficient to establish standing to seek prospective relief); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (rejecting the proposition that the plaintiff's conditional averments were "speculative 'some day' intentions"). Therefore, as the majority appears to agree, plaintiff has satisfied the first element of standing.

### B.

The second element of standing—the so-called "causation" element—requires a plaintiff to show that his injury is "fairly traceable" to the defendant's challenged action. *Fieger*, 553 F.3d at 962. In cases in which a plaintiff is harmed by the regulation of a third party, where causation will "hinge on the response of the regulated (or regulable) third party," he or she must "adduce facts showing that those choices have been or will be made in such manner as to produce causation . . . ." *Defs. of Wildlife*, 504 U.S. at 562.

Plaintiff's two-fold injury is that he must sit through a discriminatory test and must apply to law schools at a competitive disadvantage because he is required to submit the results of a test that is inherently discriminatory toward blind people. In order to establish that these injuries are traceable to the ABA, plaintiff's complaint must allege that he requested an LSAT waiver from a law school, but that the school denied his request because of Standard 503. Paragraph 25 of his complaint does just that:

> Plaintiff has endeavored in the past to obtain an LSAT waiver from one or more law schools to which he has applied but to date has been unable to secure a waiver as a result of Standard 503 promulgated by the American Bar Association.

Even more to the point, Paragraph 27 alleges:

> As a direct and proximate result of the Defendant's actions in implementing Standard 503, the Plaintiff is unable to request a reasonable accommodation in the

> form of an LSAT exemption or waiver, and instead will continue to be damaged
> by the Defendant's requirement that he take a discriminatory exam.

These allegations are more than sufficient to satisfy the second element of the standing inquiry, as they draw a connection between plaintiff's injury—being required to take a discriminatory exam and submit the results as part of his application—and defendant's challenged conduct—Standard 503's rigid requirement that law schools require each applicant to submit an LSAT score or else face sanctions or loss of accreditation.

The ABA counters that, because Standard 503 refers only to "a valid and reliable test," it does not compel any law school to require the LSAT, per se. This is sophistry. The ABA's own Interpretation 503-1 confers presumptive validity and reliability to the LSAT only, and it requires schools to prove the efficacy of any alternative test. Moreover, to use an alternative test, law schools must seek a "variance," which is only available on a programmatic basis. Thus, for purposes of plaintiff's claim regarding individual waivers, Standard 503 effectively compels law schools to require the LSAT.

The ABA also argues that Standard 503 does not dictate how much weight law schools must give to an applicant's LSAT score, and therefore law schools can give it no weight at all, amounting to a *de facto* individual waiver. This misperceives plaintiff's injury, which is being required to take the LSAT in the first place. Furthermore, plaintiff is still at a competitive disadvantage in having to submit his results, as law schools are required to report each admitted applicant's score, regardless of the weight attributed to it, for purposes of admissions statistics and rankings.

The majority takes a tack similar to the ABA. It reasons that plaintiff cannot establish causation against the ABA because his injuries are more attributable to the law schools and the creator of the LSAT, the Law School Admission Council (LSAC). It is certainly true that the LSAC and law schools play a role in plaintiff's admission process. But standing is not a zero-sum game. Nor is it limited to the first link in the chain of causation. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) (stating that standing is not a question of proximate cause). The ABA may not be solely responsible for plaintiff's injuries,

but constitutional standing requires only that an injury be "fairly traceable," not "solely traceable," to the defendant's challenged action.

The majority's "solely traceable" approach to causation is out of sync with our standing jurisprudence. Perhaps the starkest example of this incongruity is our recent decision in *Parsons*, 801 F.3d 701. In that case, a group of plaintiffs challenged the Department of Justice's (DOJ's) designation of them as a "hybrid gang" in a report disseminated to local law enforcement agencies. *Id.* at 707. The plaintiffs sued the DOJ, alleging that local law enforcement interfered with their constitutional rights in the wake of the DOJ's designation. The district court dismissed the case for lack of standing, holding that plaintiffs could not establish causation because the local law enforcement officials "exercised independent judgment in committing the alleged injuries." *Id.* at 713. This court reversed. We observed that the plaintiffs had alleged that local law enforcement officials took adverse actions against them "based on" the DOJ's designation. *Id.* at 713–14. We held that "by stating that the law enforcement officials themselves acknowledged that the DOJ gang designation had caused them to take the actions in question," the plaintiffs had sufficiently traced their injuries to the DOJ's designation. *Id.* at 714.

This case is indistinguishable from *Parsons*. The connection between the ABA and plaintiff's injuries may be indirect, much like the connection in *Parsons*. But, "the fact that an injury is indirect does not destroy standing as a matter of course." *Id.* at 713. *Parsons* makes clear that causation will lie so long as the plaintiff can connect his injury to the challenged action of the defendant. The plaintiffs in *Parsons* did that by alleging that local law enforcement officials acted "based on" the DOJ's designation. So, too, plaintiff has alleged that law schools will not grant an individual waiver "as a result of Standard 503." Accepting that allegation as true (as we must), plaintiff has demonstrated that his injuries are fairly traceable to the ABA's rule compelling law schools to require the LSAT without the option of individual waivers.

## C.

The third element of constitutional standing is whether "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Fieger*, 553 F.3d at 962. The majority concludes that plaintiff's injury is not likely to be redressed because, even if the

court struck down Standard 503, "law schools could still choose to require the LSAT in their admissions process." The Supreme Court rejected precisely this line of reasoning in *Federal Election Commission v. Akins*, 524 U.S. 11 (1998).

In *Akins*, the plaintiffs filed a complaint with the Federal Election Commission (FEC), alleging that the American Israel Public Affairs Committee (AIPAC) was a "political committee" and requesting the FEC to initiate enforcement proceedings against AIPAC. *Id.* at 13, 16. The FEC dismissed the complaint on the basis that AIPAC did not meet the statutory definition of "political committee." *Id.* at 18. The plaintiffs sued and the FEC challenged their standing, arguing that, even if it agreed with the plaintiffs that AIPAC was a "political committee," it still retained the discretionary authority not to initiate proceedings against AIPAC. *Id.* at 25. The Supreme Court rejected this argument: "[E]ven though the FEC might [have] reach[ed] the same result exercising its discretionary powers lawfully," the plaintiffs' injury was still fairly traceable to the FEC's decision to dismiss the complaint based on a purportedly incorrect reading of the statute, "for we cannot know that the FEC would have exercised its prosecutorial discretion in this way." *Id.* "For similar reasons," the Court said, "the courts . . . can 'redress' [the plaintiffs'] 'injury in fact.'" *Id.*

*Akins*' holding is equally applicable here: although a law school may retain the discretionary power to require the LSAT or deny plaintiff admission, "we cannot know that [it] would have exercised its . . . discretion in this way." *Id.* The fact that law schools may deny him a waiver in their discretion does not mean plaintiff's present injury—the unavailability of waivers altogether—is not redressable by holding Standard 503 unlawful.

In any event, according to plaintiff's complaint, the majority's prediction is likely wrong. Plaintiff has alleged that at least one law school to which he has applied denied him a waiver "as a result of Standard 503." Construing this allegation in plaintiff's favor, we must accept that law schools are willing to waive the LSAT score, but are fettered by Standard 503. In other words, plaintiff has alleged that, "absent [Standard 503], there is a substantial probability that . . . if the court affords the relief requested, the asserted [injury (the unavailability of waivers)] will be removed." *Warth*, 422 U.S. at 504. That is all that is required to satisfy the redressability requirement of Article III standing.

The basic thrust of the argument against plaintiff having standing is the notion that plaintiff has somehow sued the wrong party. This is the basis for the majority's parting legal advice about pursuing other, "more practical" legal remedies against the LSAC. The argument and advice expose the fundamental flaw in the majority's decision. By repackaging plaintiff's factual allegations into a new legal theory for him, the majority flips the construe-all-allegations-in-plaintiff's-favor standard on its head. *See id.* at 501. Indeed, the majority assumes "Binno is [not] seeking to be relieved altogether of the obligation of taking the LSAT," yet this is precisely the outcome plaintiff wants. Furthermore, it overlooks a critical allegation in plaintiff's complaint—the ABA used to allow law schools to give individual LSAT waivers. This fact dispels the myth that the ABA is not responsible for plaintiff's injuries. It also confirms what the foregoing discussion sought to show: that plaintiff's injury (the unavailability of LSAT waivers) is fairly traceable to Standard 503 and can be redressed through a judicial decision holding it unlawful.

### III.

For these reasons, I would hold that plaintiff has established Article III standing to sue the ABA. I therefore respectfully disagree with the majority's ruling regarding standing. That said, whether plaintiff has Article III standing is a separate question from whether the unavailability of a waiver under Standard 503 violates the ADA. *Id.* at 500. On the latter question, I agree with the majority's analysis of the Title III and Title V claims. I therefore join Section II.B of the majority opinion and concur in the judgment.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 12-2263

ANGELO BINNO,

        Plaintiff - Appellant,

    v.

THE AMERICAN BAR ASSOCIATION,

        Defendant - Appellee.

> **FILED**
> Jun 16, 2016
> DEBORAH S. HUNT, Clerk

Before: MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk